Number two, Dewitt v. Haney, 23-11203. And we've got a cast of thousands here. Mr. Freund and Mr. Quarles for the appellant. Ms. Connor and Ms. Painter for the appellees. And it looks like we're going Mr. Freund up first with seven minutes. Is that right? Mr. Ramey, you want to introduce your students? Thank you, Judge Newsom. May it please the court. My name is Travis Ramey. I am the director of the Appellate Advocacy Clinic at the University of Alabama School of Law. It's always a privilege to appear here before the court, particularly in this courtroom where I argued my first case. I have the distinct privilege today to introduce the court to Mr. Carson Freund and Mr. Tiger Quarles, who spent their third year of law school working in the Appellate Advocacy Clinic and who will be presenting argument on behalf of Mr. Stephen Dewitt today. Beautiful. Thank you, Mr. Ramey. And Mr. Freund, I'm sorry for that. All right, so you've got seven minutes, but zero rebuttal, right? Mr. Quarles has six minutes, but two minutes of rebuttal. OK, fire away. May it please the court. My name is Carson Freund and my co-counsel Tiger Quarles and I represent Mr. Dewitt. Your honors, the case before the court today centers around the First Amendment right to record public officials in public places, which this court recognized in Smith versus City of Cumming. Can I ask you a quick question? This is just a thought I had. So is there a First Amendment right for people to bring their cell phones into this courtroom and to video the proceedings as they're occurring? No, your honor. In Richmond newspapers versus Virginia, the Supreme Court recognized a right of access to places traditionally open to the public, such as criminal trials have long been. In that case, the Supreme Court recognized a right to attend, a right of access to criminal trials, but subject to the reasonable time, manner, and place restrictions. There was just a right for the press to be present there, to take notes, but you cannot record. And we concede that this right to record public officials in public places can be subject to reasonable time, manner, and place restrictions in both public and non-public forms. But we would argue that the right extends to more than just public forms. In Crocker, the facts were that the plaintiff was on the median of I-95, where it was unlawful to be under Florida law. In that case, the court held that in that specific situation, there was not a clearly established right to record. Who wrote that? Brilliant. Your Honor, yes, Your Honor. We think Crocker is the exception that proves the rule. We think Blackston, Smith, Crocker, and Corey all follow a consistent rule that there is a right to record public officials when a citizen is legally on public property and they are recording matters of public interest. So let me ask you about this little brilliant nugget in Crocker. In Crocker, we said of Smith, the dearth of detail about the contour of the right announced in Smith undermines any claim that it provides officers fair warning under other circumstances. So it seems to me, eventually, at the end of the road, you're going to have to overcome qualified immunity. And how do you do it in light of that? Yes, Your Honor. We argue that the dearth of detail in Smith is not fatal to our case because Corey, which also relied on Smith, held there was a clearly established right under the first element of the First Amendment retaliation claim. In Corey, the court held that it was undisputable that Ms. Corey established that there was a constitutional violation, which is that first element of the First Amendment retaliation claim, and relied on Smith to hold that. And so thus, we argue that Corey distinguished Crocker and that Crocker is rather the exception that proves the rule because of the two specific instances in Crocker where there is the chaotic nature of a fatal car crash and the fact that the citizen was filming from an unlawful vantage point, the interstate media in there. Well, let me ask you this now. We said in Smith, this is the seminal case, that the First Amendment protects the right to gather information about what public officials do on public property and specifically to record matters of public interest. So what I'm trying to figure out is, how do you allege in your complaint that what you were filming was relevant to the public interest? That's the key consideration, at least for me. Yes, Your Honor. And Mr. DeWitt's complaint states that he was there to conduct a First Amendment audit of public interest. And at the motion to dismiss stage, we should refer or infer from the complaint and draw all inferences in the light most favorable to the plaintiff. So- What's a First Amendment audit? Your Honor, a First Amendment audit is where somebody enters a, usually a public property- It's where he goes in there to try to get arrested, right? That's, I mean, this is the third or fourth case I've had where these public interest auditors have gone into these places to try to get arrested. Your Honor, we would argue that Mr. DeWitt was there to gather information for his story. And additionally, he had- Was what information? Could he conceivably be gathering at the lobby of the probation office? Well, he was there to gather information about the probation office's practices and specifically was there to interview a Miss Virginia Jackson. That's right, he was there to meet with someone, right? Yes, Your Honor. And he had previously spoken to Anthony Washington, a probation officer supervisor, who told him that he had the right to go into this publicly accessible lobby and record there and then interview Miss Jackson for his story about the probation office's practices and whether they are constitutional. Additionally, probation officers would fall under this category of public officials because we know police are undisputably public officials from previous case law, and probation officers share similar law enforcement duties. I think the concern, and I don't know if this is a valid concern or what, but the concern is that, not that he is recording the probation officers, but he's recording the probationers, right? This was the same, we had- I mean, I think it was Alabama law students who represented the people in the last case I had where they were going to a welfare office and trying to record welfare recipients. And the state's position was, look, you can record the people who work here all you want to, but it looks like you're trying to record the people who are coming to- It's kind of embarrassing to these people, maybe, to be a probationer or to need welfare or something like that. And that was the reason that they said, we don't want you recording. Yes, Your Honor. And all the probation office would have to do here is have a reasonable time, manner, and place restriction. I mean, why isn't it just, don't record in the probation office? And that could be a reasonable time, manner, and place restriction, so long as they applied that to everyone and didn't arbitrarily isolate Mr. DeWitt for the type of content, his viewpoint, that he was trying to gather for his story. If the government would only allow favorable press into their property, that would certainly be a- Hypothetically? Yes, Your Honor. That's a joke. We know that this right to gather information applies to more than traditional public forums. In Richmond, for example, the Supreme Court held there was a right to record or gather information in courtrooms, certainly a non-public forum. And in Blackston, which this court held, the plaintiff stated a First Amendment claim when they were prohibited from courting an Alabama Supreme Court Advisory Committee meeting, which is, again, at least a limited or designated public forum. So it applies to more than just traditional public forums. And I will let my co-counsel pick up from here. Well done. Thank you so much for presenting the argument this morning. Well done. All right, Mr. Quarles, let's hear from you. Your Honor, as may it please the Court, my name is Tiger Quarles, and I am also co-counsel for Mr. DeWitt. I'd like to just tag in where my co-counsel left off, specifically addressing Judge Brasher's question about the concern of probationers. When we're looking at whether it was clearly established that he had the right to record on public property, the only exception that we have seen that proves the rule comes from Crocker. And this Court made that exception strictly because he was not allowed to be on that public property at that time. So to the extent that our client was legally allowed to be within the probation office, he has a constitutionally established right to record on that public property. Can I ask you to address, and this harks back, I guess, to the argument that we just had, but the way you, or not you, but the way he pleaded the claim in the complaint is as a freedom of expression claim, right? There's no speech being articulated by recording, right? And I gather that that's probably the reason that there's been a pivot on appeal to a free press argument. That raises the question in my mind, this issue argument thing that we were talking about last go-around. To me, like a free speech claim and a free press claim do kind of feel like different, entirely different things. And I wonder if that's a pivot that's permissible on appeal. Well, Your Honor, to the extent that he needed to preserve it in his complaint, he pled that there was a freedom of expression that was violated. Expression under the First Amendment would encompass a broad range of rights. Everything from assembly, to protest, to speech, to most relevantly here, press. So he has preserved the issue of whether or not his individual right as a person exercising freedom of the press was clearly established. I guess, so one, the reason that I'm trying to kind of like sort of parse all this stuff out is that in your brief, you say the public officials did not threaten to arrest DeWitt because he was engaging in expressive behavior that would subject, that would be subject to the Freedom of Speech's public forum analysis. So it sounds like he pleaded something called freedom of expression, but in the brief here, you've said this isn't about expression, it's really about press, but now we seem to be saying that press is sort of like included within expression. Your Honor, the quote is more so meant to say that expression, he pled freedom of expression, but not expression in the form of speech. Expression in the form of speech might be a demonstration, it might be a protest, it might be a communication of a particular viewpoint, a particular ideal. Here, he has engaged in expression in the sense that he is gathering information to then distribute to others, to inform them of the constitutional rights or the constitutional practices at the probation office. Got it. Just so one more, and then I promise I'll slip it. So for our own sort of organizational purposes, you say, look, he pleaded a free expression claim, but we're not pursuing here a speech clause claim. We're pursuing here a press clause claim that was included within this pleading of freedom of expression. Yes, Your Honor. Got it. So sorry, Judge Wilson. So we could say that a probation office lobby is typically a place where expressive activity can take place, a probation office lobby. Your Honor, yes, to the extent that an individual is there to gather information. We conceded in our brief that had this been about speech or demonstration, there would be stricter barriers on how that expression and demonstration could occur in a probation office. And though there are a lot of private things that are taking place in a probation office, what about a public hospital, public hospital lobby? Would that be a place where expressive activity typically takes place? Your Honor, not all expressive activity. We distinguish between press and speech. So you could not go into a probation office and hold a large scale protest, for example. But however, to the extent that he was there to gather information, you are allowed to go in and gather information. And there are reasonable time, manner, and place restrictions on that that can be implemented. And here, we don't see someone who just popped up and had a unexpected visit to have a protest. We have someone who had a story that they were putting together. Someone who spoke to someone at the office asked if they could see in the lobby what the restrictions on recording were within that lobby. So this is not the same as someone who came into a hospital unexpectedly and started a protest or came into a probation office unexpectedly and started a protest. And additionally, Your Honor, even the public forum analysis that this court has employed in freedom of speech makes this clear. This court applies public forum analysis in the context of speech and not in the context of freedom of press. This court recently clarified in September in its decision, excuse me, in its decision, McDonough versus Garcia, that the First Amendment demands a close look when the government restricts speech, thus enters a forum analysis. So even when this court has looked to see what are the restrictions on speech, they have only done, applied a forum analysis in those circumstances, not when it relates to freedom of press. This may carry you over your time a little bit, but can you explain to me like sort of why that is? Like, what are the reasons that a forum analysis would apply to a speech claim? But not a press claim. When speech is imitated, particularly through protest, it is inherently disruptive. So in a park, it's more permissible that that type of disruption would be allowed. It's a type of place where it's open to the public and you can make yourself heard as well as enjoy the general amenities of the park. And then you move to a non-public forum, say like a probation office, and that type of demonstration is far less appropriate. As it relates to the right to gather information, the right to gather information exists outside of just those extremely public areas. To the extent that an individual needs to interview a specific individual within one of those offices, they may have to go to that office to ask those questions and gather that information. Okay, very well. Thank you very much, Mr. Quarles. You've got two minutes remaining. Thank you for the argument. All right, Ms. Conner, eight minutes. And just so I'm clear, you guys represent different defendants, correct? Yes, Your Honor. Got it. May it please the court. Jessica Conner, I represent the probation officer, Supervisor Sarissa Haney, along with my co-counsel at Council Tables, Alyssa Flood, and for the co-appellee police officers, Attorney Jennifer Blanton. Okay, very well. Thank you. The district court correctly held Ms. Haney is entitled to qualified immunity for two main reasons. Number one, there is no case law from any jurisdiction with indistinguishable facts clearly establishing a First Amendment right to record in a non-public forum, such as a probation office lobby. And number two, this court in Crocker has already rejected the argument that Smith broadly established a right to record on any publicly accessible property. And instead, this court found that Smith only recognized, a right to record police conduct in public forums, end quote. This court has not extended Smith's general pronouncement to any non-public forum. And in Crocker, if I may, this court quoted two cases which I think are very important, if not dispositive here. This court quoted the Supreme Court in United States versus Grace, which held, publicly owned or operated property does not become a public forum simply because members of the public are permitted to come and go at will. And this court in Crocker also quoted the DC Circuit Court of Appeals in Hodge versus Hawkins, which held, quote, the Supreme Court's plaza status as a non-public forum is unaffected by the public's unrestricted access to the plaza at virtually any time. And so just because a probation office lobby is generally accessible to the public does not turn it into a public forum open for expressive conduct. Let me ask you this question. What if Stephen DeWitt was not the plaintiff in this case, but it was a reporter from the New York Times or the Washington Post, and the newspapers had information that there were some things taking place in the probation office, maybe the violation of probationer's rights. Would they have a right to be there and record and gather information in the public interest to write a story for the New York Times or the Washington Post? So I don't think it matters where you're from when you're saying you're with the press. It doesn't matter if it's New York Times or a local news station or an individual reporter. That I don't think matters. But I think what is by now clear from the United States Supreme Court is that the right to gather information does not go hand in hand with the right to record. And we know that because of this courthouse and every federal courthouse and most state courthouses has a right to access. Well, what if it was CNN then? I'm sorry? What if it's CNN or MSNBC or Fox News? I don't think that changes the analysis because it's about the right to access information. And while there may be a right to access information, there's not a right to record. So for instance, the public and the press have the right to come to court proceedings and to observe and take notes and gather information about that proceeding and then to report on that. But it is clear from the United States Supreme Court and several other of this court's sister circuit courts that that right to gather information during legal proceedings and criminal trials does not guarantee a First Amendment right to record those proceedings. So somebody could come into the probation office lobby and make a public records request to gain information, but they're not entitled to come in and demand that people who do not want to be filmed for a story, for a YouTube video, that they have the right to force those people to be recorded, to walk up to public servants who are just trying to go about their duties in a non-public forum, where they're not expecting to be observed like in this courtroom, like everybody here, who there's an expectation to come to these type of proceedings and observe and learn from what's in report on what's happening. Here's a weird thing. I don't really think they debate that point, but it seems like they're drawing a line and they're saying, look, we have the right, but there are also reasonable time, place, and manner restrictions, and that's kind of what we have here is a reasonable time, place, and manner restriction, but that there wasn't really one of those for this lobby. That seems to be what they're saying. Well, as this court noted in Crocker, a non-public forum does not have to open that forum up to speech subject to time, place, and manner restrictions. But I guess, so I think that's the distinction they're drawing. They're saying, look, the hypotheticals that you're giving, which is why you can't record in a certain place or whatever, a hospital lobby, that kind of thing, that's really more time, place, and manner, and this isn't a case about time, place, and manner. That seems to be what they're saying. No, I'm not exactly sure what they're saying, but I don't think this case is about, I don't think it's actually about time. Is that a distinction? Maybe the right question is like, is that a distinction that matters for purposes of qualified immunity? Matters, and I don't think that that is their argument. I think they are arguing that they have an absolute First Amendment right to record on any publicly accessible property, and they do not have that right, and at the very least, the law is not clearly established for purposes of qualified immunity that Ms. Haney was supposed to know that there is a unfettered absolute right to record in any non-public form that is publicly accessible, just because the public is generally allowed to come and go doesn't guarantee them the right to record there, and I think Ms. Haney was eminently reasonable in telling Mr. DeWitt that he could not record here without the permission of staff in the probation office and that he had to leave, and she didn't trespass him. She didn't ask him to be arrested. He was not arrested. She just asked him to leave. She didn't prohibit him from ever returning, but I think she was very reasonable based on the jurisprudence from this circuit that there is not an unfettered right to record just because it's in public or public property. Form analysis matters, whether it's- So let me just ask you before you sit down, because Mr. Quarles says form analysis doesn't matter if we're talking about the press clause. Why is he wrong about that? I don't think that that is a serious argument. Well, tell me why. Because in every case where this has been, where the Supreme Court has analyzed whether or not the press have a right to gather information, a right to know, and every court who has looked at that has said that there simply is no distinction for the press. We still employ form analysis, and we look at what the purpose of the particular government-owned property is, and form analysis always applies. So I guess, especially if you're going to say it's not a serious argument and the Supreme Court has basically held this, like, what are the cases, maybe I just haven't found them, but what are the cases where the Supreme Court says form analysis clearly applies to press claims? I don't know that it's expressly stated in that way, but it's clear that they're looking at the nature of whatever the government property is, the courthouse, what is the nature of it, that it is a non-public form, and I think there's plenty of cases that recognize a courthouse as a non-public form. And if I could at least cite to the Yonkers case out of the Second Circuit, that court said the First Amendment right of access is limited to physical presence at trials, and appellant's asserted right to know is not strengthened, or I'm sorry, the appellant's asserted right to record is not strengthened by reference to the public's right to know. And several courts, also in Sefick versus Gardner, this is a Seventh Circuit case, held that the lobby of the federal courthouse is not a traditional public forum, or a designated public forum, not a place open to the public for the presentation of views, thus no one can hold a political rally there. And so I think whenever, and that is talking about speech and not necessarily just restricted to the press, but virtually every case is taking into account the characteristics of the property when deciding what restrictions can be placed on the press or on expressive conduct like speech. The freedom of the press is a form of expressive conduct, it's not verbal speech, but they're collecting information so that they can report on it. So forum analysis goes into play in consideration whether we're talking about freedom of, to gather information, to access. Anytime you're going to access government property, forum analysis has always come into play, whether or not it's expressly called that, it's important, and at least for qualified immunity. I tell you what, let's, since we're over time, let's let your co-counsel pick up where you're leaving off. I didn't do as good a job. No, no, no, it's all good, it's all good. You were in the zone, it's all good. You're used to the 15 minutes, you know. Good morning, your honors, and may it please the court. My name is Jennifer Painter, and I represent the Appalese Officer Trent Sexton and Officer Melanie Preddy with the Tallahassee Police Department. In July of 2021, Officer Sexton and Officer Preddy responded to a call for service at the county's probation office, where they were informed by the office supervisor, Ms. Haney, that a person was at the office refusing to leave. The only issue here today, as it relates to the officers, is whether reasonable officials would have understood that escorting Mr. DeWitt from the county probation office at the request of the supervisor violated a clearly established constitutional right. So in other words, was there a clearly established right for a person to go to a government office, remain with no official purpose or business therein, after being told to leave by an authorized person? There is not, and for that reason, we ask the court to affirm the lower court's dismissal. As the Supreme Court instructed in Perry and Cornelius, the government, just like a private landowner, has the power to preserve the property under its control for the use to which it is lawfully dedicated. This was a probation office designed to meet the needs for the county's pretrial, probation, and drug testing services. It is not in dispute Mr. DeWitt was not at the probation office for any probation, pretrial, or drug testing services. He was not there for official business. Mr. DeWitt concedes in his reply brief that the county probation office was likely a non-public forum, but the lobby was publicly accessible. However, we know that publicly accessible does not mean public forum, simply because the public is permitted to come and go at will. Florida law makes it a crime to refuse to leave a structure after being warned by an authorized person. And there's the distinction between the officers versus Ms. Haney. The officers did not trespass Mr. DeWitt. The officers did not tell Mr. DeWitt that he needed to stop filming or that he wasn't allowed to record there. The officers were called to the office based on a suspected trespass, a person that was refusing to leave. Based on Mr. DeWitt's asserted facts, Ms. Haney was the supervisor of the office, Ms. Haney told him to leave, and he refused. When he asked Officer Sexton, why do I need to leave? Officer Sexton replied, based on Mr. DeWitt's facts, because you have no business here and they can tell you to leave. Mr. DeWitt does not assert any facts that the officers removed him from that office because he was recording, because he was filming, or because of his viewpoint. It is reasonable, again, to restrict access to a county probation office to people that are there for official business. The officers reasonably relied on the direction of the office supervisor who controlled access to that space when she informed them that Mr. DeWitt had no purpose at the office. The officers at that point were simply performing their duty consistent with state law. Qualified immunity shields officers unless their conduct violates clearly established law, meaning a law that is so clear that every reasonable officer would understand that what they're doing is unlawful. As the Supreme Court has made clear in Anderson, for example, the qualified immunity inquiry is context-specific, and that's because officers are not required to guess at the boundaries of evolving constitutional law in real time. Again, they were responding to a call for service based on a person who was in the Leon County Probation Office refusing to leave. They were there in response to a suspected trespass. Yeah, so your position for the officers is sort of to try to disassociate themselves from the recording or whatever, but I mean, can you really do that? Like, this was a motion to dismiss, right? I mean, what if his allegation had been that they removed him from the office because it was his race?  That it was like, look, the reason why the probation people wanted me out of the office is because of my race, and these two officers showed up and they kicked me out of the office. Is it really fair for the officer to say, like, well, we were just doing our job. We just showed up and removed you. We didn't know why. I don't know about that. Right, we agree, Your Honor, that if we change the facts that were asserted by Mr. DeWitt, we certainly would change the outcome and certainly change the pleading as far as the motion to dismiss phase. But what we have here, based on Mr. DeWitt's assertions, is that Sarissa Haney was the supervisor of this office, that she told him to leave and he refused. And again, based on his own assertions, when he asked, why do I need to leave? The officer said, because you have no business here and they can tell you to leave. If Mr. DeWitt was outside, for example, in a park and filming, an officer said to him. Well, no, no, no, I'm sorry. I'm just saying, like, why can the officers get off by saying, look, we didn't know why we were removing him? That's what I don't get. You seem to be saying, well, look, the officers show up and all they know is they're removing this guy because somebody wanted him removed. How does that matter? Your Honor, this is based simply on Mr. DeWitt's factual assertions. But isn't he saying, I mean, isn't he saying that, I mean, maybe I'm wrong about what the complaint says, but I thought the complaint says they, the, I guess it's Haney, wanted to kick me out of the office because I was recording and then two officers showed up and then did that. He said, I believe in his complaint was that he was told he cannot record there and that he needed to leave. He refused to leave. And at that point, Ms. Haney said, if you refuse to leave, I'm going to have to call law enforcement, somewhere along those terms. And then that's when law enforcement was called and our officers, Officer Sexton and Officer Pretty responded to the scene. Mr. DeWitt said they go behind into Ms. Haney's office and then when they come out, Officer Sexton says, you need to leave. He said, why? And he said, you have no business here and they can tell you to leave. So again, if Mr. DeWitt had asserted any kind of pretext reason for why he was removed from that building, then it would be a very different discussion and a different analysis. I just don't know about that. I mean, I just don't know about that. I mean, why is it, why can the officers, I mean, and maybe I don't think you need to make this point, but it seems like the point you're trying to make is you're trying to say, look, the officers can just remove him because they wanted him removed and not have to deal with this First Amendment claim at all. I just don't know about that. And they would, Your Honor, and that is a fair point. I mean, again, if this was a city commission or a public park or the steps of a courthouse, and they were called to the scene and said, hey, we wanna trespass this person, again, that would be a different discussion and a different analysis. What we have here is a government office, a non-public space where we need to have the restriction be reasonable and viewpoint neutral. They were told he could not be here because he had no official business therein. It's reasonable to restrict access to that space based on people that are there for official business. And again, Mr. DeWitt does not assert any viewpoint reason for the officers removing him from that lobby. I see that I'm out of time. Thank you very much. Sir, very well. Thank you so much. All right, Mr. Quarles, two minutes. Lightning round. Your Honor, just a couple of quick points on rebuttal. I first wanna address the arguments for Sexton and Pretty. Their counsel says that Mr. DeWitt was told that he had no business there, but Mr. DeWitt told them of the business that he had there. He told them that he had called ahead to Mr. Washington and that he had made plans to speak to Virginia Jackson and that he was told he could wait in the lobby. And in waiting for the lobby, he was told he could record. At the motion to dismiss stage, we have to take all these well-pleaded facts as true. And in taking them as true, he had business there as someone who's exercising freedom of press to gather information about the constitutional practices of the probation office. Additionally, we can look to the conversation that occurred outside of Mr. DeWitt's presence and we can infer that they knew what he was doing there. We can't assume that the officers had no knowledge whatsoever. There was a conversation that happened before they came into the room. I mean, we can infer from that conversation and find that they likely knew what was going on and why they were seeking to expel him from the property. Additionally, Your Honor, they knew he didn't trespass because they tried to solicit a trespass from Haney and Haney did not issue that trespass. So he wasn't trespassing. And when Mr. DeWitt asked what law he had violated, the officers didn't cite any specific law that he had violated. I'd like to address Haney's counsel as well. Haney's counsel tries to force a forum analysis, yet Haney's counsel can't point to any case where a forum analysis has been required under freedom of press as opposed to freedom of speech. Finally, Your Honor, Haney's counsel also suggests that we say that there's an unfettered rights record on public property. That's not our position. Our position is that there's a rights record on public property subject to reasonable time, manner, and place restrictions and that you cannot discriminate based on content. So long as there's a content neutral, time, manner, and place restriction, our client had a right to record in the probation office. Thank you. Very well, thank you. Mr. Ramey, thank you for taking the case for the clinic. And Mr. Friend, Mr. Quarles, well done. Thank you very much for your service to the court. That case is submitted. We'll move to the.